UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MANUEL MOSES, as Administrator D.B.N. of the
Goods, Chattels, and Credits which were of Zoran
Teodorovic, Deceased,

Plaintiff,

– against –

WESTCHESTER COUNTY DEPARTMENT OF
CORRECTION, WESTCHESTER COUNTY, and
PAUL M. COTÉ,

Defendants.

**OPINION AND ORDER**

10 Civ. 9468 (ER)

---

Ramos, D.J.:

Before the Court are Plaintiff's motion for summary judgment and the cross-motion of

Defendants Westchester County Department of Correction ("DOC") and Westchester County

("County") (together, the "County Defendants") for summary judgment.[1]  For the following

reasons, Plaintiff's motion is DENIED and County Defendants' cross-motion is GRANTED.

# I.     FACTUAL BACKGROUND[2]

## 1.  The Incident and Subsequent Investigation

In early October, 2000,[3] Zoran Teodorovic ("Teodorovic"), a 46 year old man of Serbian

origin, was arrested for criminal trespass in the second degree by the Mount Vernon Police.  Pl.'s

---

[1] *Pro se* defendant Paul Coté has not responded to Plaintiff's motion or cross-moved.

[2] The following facts are drawn from Plaintiff's 56.1 Statement of Undisputed Facts ("Pl.'s 56.1") (Doc. 163),
County Defendants' Response to Rule 56.1 Statement of Material Facts ("Defs.' 56.1") (Doc. 174), Plaintiff's Facts
and Objections ("Pl.'s Reply 56.1") (Doc. 181), and the parties' supporting submissions.

[3] The parties do not indicate when in October 2000 Teodorovic was arrested.  However, the mental health screening
intake form from the Jail is dated October 5, 2000, and it indicates that he was arrested "just days before."  Pl.'s 56.1
¶ 16; Pl.'s 56.1 Ex. 1.

56.1 ¶ 16; Defs.' 56.1 ¶ 153. He was unable to pay bail and was detained at the Westchester County Jail ("Jail") in Valhalla, New York while awaiting trial. Pl.'s 56.1 ¶¶ 1, 17. Upon his admittance, Teodorovic showed signs of depression and other potentially abnormal behavior, and he was therefore placed in the cell block where individuals with mental health issues were housed. *Id.* ¶¶ 18–19.

In the late afternoon of October 10, 2000, Correction Officer ("C.O.") John Reimer ("Reimer") ordered Teodorovic to clean his cell. *Id.* ¶ 20. Teodorovic refused. *Id.* As a result, Reimer assigned another inmate to clean his cell instead. *Id.* After the inmate was done cleaning, Reimer, who was in the control room, used the announcement system to order Teodorovic into his cell, but Teodorovic was unresponsive to that order. *Id.* After Teodorovic failed to respond, Reimer exited the control room and entered the housing unit where Teodorovic was located. *Id.* ¶¶ 20–21.

The exact details of what happened next are not entirely clear. The initial reports of the incident filed by Reimer and defendant C.O. Paul Coté ("Coté ") stated that at approximately 5:09 p.m., Teodorovic struck Reimer in the face and that Reimer and Coté then restrained Teodorovic, wrestling him to the floor. *See* Defs.' 56.1 ¶ 22. They claimed that Teodorovic injured his head in the process. *Id.* However, Reimer later admitted that these initial reports were false. *Id.* Specifically, on December 3, 2001, Reimer filed a sworn statement with the DOC's Special Investigation Unit ("SIU") in which he described that after the incident, Sergeant Woods ("Woods"),[4] against protocol, handed him a copy of Coté's report and assisted Reimer in fabricating details of the incident to be consistent with Coté's narrative. *See* Pl.'s 56.1 Ex. 6.

---

[4] Woods was assigned as the first floor supervisor for the Jail, was of the officers who responded to the incident, and was responsible for commencing the investigation. *See* Defs.' 56.1 ¶¶ 10, 43.

Reimer's sworn statement indicated that Woods encouraged him to file the inaccurate report because they needed to "cover [their] ass[es]" and make sure everything was in line. *Id.* at 5. Specifically, Reimer indicated that he and Coté omitted from their reports that Teodorovic's head injury was not caused by the fall to the ground, but because Coté repeatedly kicked and punched him in the head. Pl.'s 56.1 ¶¶ 22–23; Defs.' 56.1 ¶ 170.[5]

After the incident, the alarm was sounded, and among the first responding officers were the Emergency Response Team ("ERT"). Pl.'s 56.1 ¶¶ 33–34. At approximately 5:10 p.m., ERT took custody of Teodorovic, handcuffed him, and assessed his physical condition. *Id.* ¶¶ 34–35; Defs.' 56.1 ¶ 155. Teodorovic was lying on the floor, unresponsive, and there was blood around his head. Pl.'s 56.1 ¶¶ 35–36. One of the responders, Sergeant Gannon ("Gannon"), then signaled a "code 3," seeking medical assistance, and removed the handcuffs. *Id.* Gannon later testified in Coté's federal criminal trial that he witnessed Coté and Reimer restraining Teodorovic on the floor while he appeared unconscious, and that Coté was using profanity and yelling at Teodorovic, "You mother fucker, don't you spit on–who are you to spit on officers? You better fuckin respect officers. You shithead." *Id.* ¶ 37.[6]

After the incident, at approximately 6:05 p.m. that evening, Teodorovic was admitted to Westchester County Medical Center with serious injuries. *Id.* ¶¶ 28, 77; Defs.' 56.1 ¶ 157. A trauma consultation was immediately ordered, Teodorovic was intubated, and he received various x-rays. Defs.' 56.1 ¶ 28. Approximately four hours after he was admitted, the hospital conducted a neurosurgery evaluation, and a head scan was completed around midnight. *Id.* A

---

[5] When Coté was questioned why he hid these details about his use of force from his superiors, he stated that he was "afraid [of] the repercussions [he] would suffer from [his] department." Defs.' 56.1 ¶ 22; *see also id.* ¶¶ 22, 170 (referencing Coté's testimony that he "felt that [his] department wouldn't warrant the type of force that was needed to get this struggle under control or stop the inmate from resisting").

[6] At trial, Gannon testified that he did not file any written records of his eyewitness account of the incident and he did not report his observations to any authorities until the week before Coté's federal trial in 2006. *Id.*

second head scan was performed about an hour and a half later.  *Id.*  Dr. Deborah Benzil, the Director of Neurotrauma at the Westchester County Medical Center, was the neurosurgeon on call who examined and treated Teodorovic.  *United States v. Coté*, 544 F.3d 88, 91 (2d Cir. 2008); *see also* Defs.' 56.1 ¶ 28.  She testified at trial about the injuries she observed, noting extensive external and internal injuries to his face and head, including "extensive bruising" behind the left eye and on the right cheek, abrasions and lacerations on his head, blood in his right ear, "extensive swelling" on both sides of the back of his head, and multiple fractures in several areas.  *Coté*, 544 F.3d at 91.  Teodorovic later lapsed into a coma at the medical facility.  Pl.'s 56.1 ¶ 77; Defs.' 56.1 ¶ 157.  Teodorovic remained in a coma for the next fourteen months, and died on December 21, 2001.  Defs.' 56.1 ¶ 204.

Assistant Warden O'Neill was present at the Jail at the time of the incident.  Pl.'s 56.1 ¶ 45.  The parties dispute whether he was the highest-ranking officer present and when he became aware of the incident.  *See* Defs.' 56.1 ¶¶ 45–47.  Plaintiff alleges that O'Neill made no effort to investigate the incident or Teodorovic's condition, and did not preserve the scene of the incident.  Plaintiff's Memorandum of Law in Support of Summary Judgment ("Pl.'s Mem. L.") (Doc. 165) at 13.  On October 10, 2000, at approximately 9:45 p.m., the matter was referred to SIU.  Defs.' 56.1 ¶ 194.  Later that same night, the Jail also reported the incident to the New York State Commission of Correction.  *Id.* ¶ 47.[7]

The following day, October 11, 2000, the DOC suspended Coté.  *Id.* ¶ 195.  That same day, at approximately 9:30 a.m., SIU notified the Westchester County Police Department ("WCPD") about the incident, which then assumed the investigation.  *Id.* ¶ 47.  That same day,

---

[7] Plaintiff apparently disputes that SIU was notified, stating, "And while a box was checked related to SIU it is unknown if a copy actually went to SIU . . . ."  However, Plaintiff points to no evidence to suggest that SIU was not informed of the incident.  Pl.'s Opp. at 42.

the WCPD went to the hospital, documented Teodorovic's injuries, spoke with his physician, and interviewed Coté. *See* Pl.'s 56.1 Ex. 82 at 7. The WCPD's investigation culminated in Coté's arrest on November 15, 2000. Defs.' 56.1 ¶ 196. A grand jury subsequently indicted Coté on two counts of assault in the first degree in violation of Section 120.10 of the New York Penal Law. *Id.* ¶ 197; *see also Coté*, 544 F.3d at 91.

On January 5, 2001, the DOC imposed formal disciplinary charges against Coté. Defs.' 56.1 ¶ 198. On July 13, 2001, a state jury acquitted Coté of assault in the first degree but convicted him of the lesser-included offense of assault in the second degree (*i.e.*, reckless assault). *Id.* ¶ 199. Coté was sentenced to three months of incarceration, and served two months before being released on November 27, 2001. *Id.*; *see also Coté*, 544 F.3d at 91. That same day, the DOC terminated Coté from his employment. *Id.* ¶ 200. The following month, on December 21, 2001, Teodorovic passed away while still in the coma. *See id.* ¶¶ 200, 204. The Medical Examiner determined that the cause of death was a "homicidal assault." *Id.* ¶ 200.

On November 20, 2000, while Teodorovic was still in a coma and Coté's state criminal prosecution was proceeding, the Federal Bureau of Investigation ("FBI") opened an inquiry into whether Coté used excessive force against Teodorovic. *Coté*, 544 F.3d at 91. On March 22, 2002, the FBI requested that the DOC turn over all of its records relating to the incident. Defs.' 56.1 ¶ 41. On April 30, 2002, the DOC turned over to the FBI its SIU records relating to the matter, along with Coté's personnel file. *Id.*

Approximately four years later, on February 6, 2006, Coté was indicted by a grand jury sitting in the Southern District of New York for violating 18 U.S.C. § 242, the criminal counterpart of § 1983, and, on September 20, 2006, was convicted by a federal jury of that charge. *Id.* ¶ 210; *see also Coté*, 544 F.3d at 92, 96. However, the district judge overturned the

conviction. *Id.* at 96. On September 24, 2008, the Second Circuit reversed and upheld the conviction. *Id.*

Reimer was granted immunity for the incident and testified for the Government as a witness in Coté's federal criminal trial. Pl.'s 56.1 ¶ 24; *see also Coté*, 544 F.3d at 92.[8] After the events in question, he was promoted twice, first to Sergeant, and later to Captain. Pl.'s 56.1 ¶ 32. He has since retired from his employment with DOC. Defs.' 56.1 ¶ 32.

On August 30, 2007, the Department of Justice ("DOJ") Civil Rights Division and the United States Attorney's Office for the Southern District of New York notified Westchester County of its intent to conduct an investigation at the Jail pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"). *See* Pl.'s 56.1 Ex. 83 ("DOJ Report") at 1.[9] The DOJ conducted an on-site inspection of the Jail from February 25 to 28, 2008. *Id.* As part of the investigation, the DOJ reviewed hundreds of use of force incidents from 2006–2007, dozens of which were captured on videotape, and found that the Jail "inadequately review[ed] use of force incidents to prevent a pattern of use of excessive force against inmates" and "fail[ed] to maintain an adequate detainee grievance system, further contributing to the problems of monitoring and

---

[8] Specifically, Reimer was provided use immunity with respect to a statement he provided to the New York State Assistant District Attorney on October, 20, 2000, as well as for testimony provided to the grand jury. Defs.' 56.1 ¶ 24. It is unclear whether Reimer also received departmental immunity, or whether there was simply a decision not to bring departmental charges against Reimer. *See id.*

[9] Plaintiff points to a New York Times news article, which states, "[t]he impetus for the [DOJ] investigation was the 2000 beating and kicking of a mentally ill inmate who eventually died of his injuries. In June, Paul M. Cote, 43, a former correction officer at the jail, was sentenced to six years in prison in connection with the case." *See* Pl.'s 56.1 ¶ 88. County Defendants object to the admissibility of this article, arguing that it is hearsay because Plaintiff is attempting to use the article to prove the truth of the matter asserted—namely that Teodorovic's death triggered the DOJ Report—and because the article does not provide the source for the statements. Defs.' R. 56.1 ¶ 88. Plaintiff provides no hearsay exception for the admissibility of this evidence, and the Court finds that this article is inadmissible hearsay. *See, e.g., Tokio Marine & Fire Ins. Co. v. Rosner*, 206 F. App'x 90, 95 (2d Cir. 2006) (holding newspaper article is inadmissible hearsay); *Roniger v. McCall*, 119 F. Supp. 2d 407, 410 (S.D.N.Y. 2000) ("These [newspaper] articles would be inadmissible hearsay if offered for the truth of the matters reported therein, even though those matters may be relevant to [the] case . . ."). Plaintiff points to no additional evidence in the record to suggest that the DOJ investigation was triggered by Teodorovic's death.

investigat[ing] use of force incidents." *Id.* at 8, 13, 16.  Additionally, with respect to excessive

force, the DOJ found that the County failed to:  (1) maintain an adequate use of force reporting

mechanism; (2) adequately discipline officers for using excessive force against inmates; and (3)

initiate measures to discipline officers who use excessive force.  *Id.* at 14, 17.  The DOJ further

found that, *inter alia*, the Jail "systemically violate[d] the constitutional rights of inmates,"

"fail[ed] to . . . adequately protect inmates from harm and serious risk of harm from staff," and

failed to provide inmates with "adequate medical and mental care."  *See* Pl.'s 56.1 Ex. 83 ("DOJ

Press Release") at 1.  The DOJ's letter recommended that the Jail undertake certain remedial

actions "[i]n order to address the constitutional deficiencies [] and protect the constitutional

rights of detainees."  DOJ Report at 31.[10]

### 2. The Jail's Efforts to Contact Teodorovic's Family and Their Efforts to File Suit

Teodorovic is a Serbian national.  The only contact information that Teodorovic provided

for the DOC upon his admission to the Jail in October 2000 was the telephone number of

---

[10] The DOC recommended that the Jail undertake several steps, including the following:

> Develop and maintain comprehensive policies and procedures, consistent with current legal standards, regarding permissible use of force. Such policies and procedure should specifically include, *inter alia*, the following:  (i) Definitions of force and excessive or unnecessary force . . . ; and (iv) Prohibition on the use of force as punishment.

> Establish effective oversight of the use of force.

> Develop an effective and comprehensive training program in the appropriate use of force.

> Develop and implement policies, procedures, and practices to ensure inmates have access to an adequate grievance process that ensures that grievances are processed and legitimate grievances addressed and remedied in a timely manner, responses are documented and communicated to inmates, inmates need not confront staff prior to filing grievances about them, and inmates may file grievances confidentially.

> Ensure that inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, referred for investigation.

> Ensure inmates have adequate access to health care.

*Id.* at 31–41.

Stephanie Bentley ("Bentley"), his stepmother, although he listed his birth mother's first name

(Rajna Teodorovic ("Rajna"))[11] without providing any contact information.  Defs.' 56.1 ¶ 191;

Defs.' 56.1 Ex. Y.  Bentley married Teodorovic's father, George Teodorovic, in 1962, and she

immigrated to the United States in 1963 from Slovenia.  Defs.' 56.1 ¶¶ 148–149.  George

Teodorovic passed away in the 1980s, after which Teodorovic immigrated to the United States.

*Id.* ¶ 148.  Prior to that time, Teodorovic lived in Serbia with a relative.  *Id.* ¶ 150.  Bentley

speaks English and worked as a financial analyst for Blue Cross for approximately thirty-five

years before she retired in September 2000.  *Id.* ¶ 150; Pl.'s 56.1 Ex. 10 (Bentley Deposition) at

6:10–7:10.

At approximately 4:00 a.m. on October 11, 2000, the night of the incident, Bentley

received a phone call from the DOC Chaplain Reverend Charles Albert indicating that

Teodorovic was gravely ill and in the hospital.  Defs.' 56.1 ¶ 190; Bentley Deposition at 25:17–

23 (confirming that she received a telephone call from a priest during which she was advised that

Zoran Teodorovic "was almost dead."); Defs.' 56.1 Exs. W, X.

Teodorovic's biological sister by another father, Mirka Furst ("Furst"), first became

aware of his injuries approximately fourteen months after the incident in December 2001, when

she was advised by Bentley that he had been "deathly injured."   Defs.' 56.1 ¶¶ 152, 255, 259.

Additionally, in February 2002, Bentley wrote to Furst stating, "[t]he lawyers informed me that

[Teodorovic] lost his life after 6 months in a coma from which he did not awake."  *Id.* ¶ 259.

Bentley also indicated that she gave Furst and Rajna's addresses to an attorney who represented

Teodorovic, Joseph Maria, so that he could be in touch to sue the Jail.  Pl.'s 56.1 Reply ¶ 261.

Furst claims that no one ever contacted her or Rajna.  *Id.*

---

[11] Rajna resided in Sweden.  *See* Pl.'s Reply 56.1 ¶ 261.

In November 2004, Furst gave authority to the Embassy of Serbia & Montenegro in Washington to issue subsidiary power of authority to a lawyer that she would retain. *Id.* ¶¶ 261–262.[12]  In February 2006, the FBI also contacted Furst and told her about Teodorovic's death, but provided no additional information.  Pl.'s 56.1 Reply ¶ 261 (citing chronology prepared by Furst).  As of February 7, 2006, Furst had researched Teodorovic's death and found information relating to the proceedings against Coté on the internet.  Defs.' 56.1 ¶ 263.  On May 8, 2006, an FBI investigator visited Rajna in Sweden.  Pl.'s Reply 56.1 ¶ 261 (citing chronology prepared by Furst).  Shortly thereafter, on May 15, 2006, Teodorovic's biological mother gave Furst all rights to commence civil litigation on behalf of Teodorovic through a signed Power of Attorney.  *Id.* ¶¶ 264–269; Defs.' 56.1 Ex. XX.[13]  On May 19, 2006, Furst went to the United States Embassy in Serbia and provided them with pictures of Teodorovic and other documentation.  *Id.* ¶ 261.

In June 2006, the DOJ wrote a letter to the Embassy of Serbia and Montenegro which stated in part that Teodorovic's family might want to contact a civil attorney in the United States regarding civil remedies.  Defs.' 56.1 ¶ 268; Defs.' 56.1 Ex. YY.[14]  Furst retained the law firm of Tolmage, Peskin, Harris & Falick on September 29, 2006, and signed a New York Statutory Short Form General Durable Power of Attorney providing Stephan H. Peskin, Esq. ("Peskin"),

---

[12] The letter also indicates that the Embassy could "take all necessary actions in connection with the search for the absentee [Teodorovic]."  *Id.*  Plaintiff notes that, at the time, Furst was only told "unofficially" of Teodorovic's death by Bentley, and it was not until 2006 that she was contacted by an FBI agent and informed through official channels of his death.  *See* Pl.'s Reply 56.1 ¶ 261.

[13] Plaintiff states without further explanation that this Power of Attorney is not proper under New York State General Obligations Law.  Pl.'s 56.1 Reply ¶¶ 266–268.

[14] Defendants state that shortly thereafter on July 25, 2006, that letter was forwarded to Furst, but the exhibit itself provided to the Court only contains the cover letter, and not a copy of the letter from the DOJ, so it is unclear what Furst actually received.  *See* Defs.' 56.1 ¶ 269; Defs.' 56.1 Ex. EE.

with authority to act on her behalf with respect to estate transactions, claims and litigation, and "all matters pertaining to" Teodorovic.  *See* Defs.' 56.1 ¶¶ 270–71; Defs.' 56.1 Ex. AAA.

Shortly thereafter, on November 22, 2006, Furst was appointed as co-administrator for the estate along with Brian Kelly ("Kelly"), another attorney from Tolmage, Peskin, Harris & Falick.  *See* Defs.' 56.1 ¶ 272; Doc. 17-1 ¶ 8.  Furst, through Peskin, then undertook to preserve Teodorovic's claims by attempting to file a late notice of claim in state court, but the application was denied on April 17, 2007.  Defs.' 56.1 ¶ 273.  Peskin was aware that, even though the Westchester Supreme Court denied the application to file a late notice of claim, he was permitted to proceed with a 42 U.S.C. §1983 claim against the County Defendants.  *See* Peskin's Reply Affirmation in Support of Motion, ¶ 9 (Doc. 17-1 at 29) (stating that, "it is clear that a notice of claim is not necessary to commence an action under 42 USC [§] 1983 nor with regard to the County's responsibilities to the estate with regard to its claim pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978).").  Peskin then opted not to initiate a lawsuit because "even if there [was] a conviction against [Coté] there [would] be no cause against the County of Westchester which has the money as opposed to the individual corrections officer who has no money" and therefore "it would appear to be a waste of time to file a lawsuit . . . ."  Defs.' 56.1 Ex. BBB (November 20, 2007 Letter from Peskin to the Consulate General of the Republic of Serbia).

Teodorovic's family eventually found another attorney, Manuel Moses ("Plaintiff"), and went through the process of petitioning to appoint him as administrator of Teodorovic's estate. Complaint ("Compl.") (Doc. 1) ¶ 18.  The petition and supporting papers were filed with the

Surrogate's Court of the State of New York for the County of Westchester on September 2 and 20, 2010, and the court revoked the letters of administration for Kelly and Furst and appointed Moses as administrator of the estate on December 20, 2010. *See* Doc 1-3.

## II.     PROCEDURAL BACKGROUND

On December 21, 2010, Plaintiff, as executor of Teodorovic's estate, initiated the instant action approximately ten years after the incident. *See* Doc. 1. Plaintiff's claims, brought pursuant to 42 U.S.C. § 1983 ("Section 1983"), allege that Coté violated Teodorovic's federal constitutional rights and that the County Defendants are liable as well for Coté's actions.[15]

On January 13, 2011, the County Defendants moved to dismiss the claims on the basis that the lawsuit was not filed within the applicable statute of limitations and for failure to meet the statutory notice of claim requirements of New York State General Municipal Law Sections 50e and 50i. Doc. 7. The motion was referred to Magistrate Judge Ronald L. Ellis. *See* Docs. 3, 6. On July 18, 2011, Judge Ellis issued a Report and Recommendation ("R & R") recommending that the motion to dismiss be denied with respect to Plaintiff's § 1983 claim, but granted with respect to all of Plaintiff's state law claims. Doc. 16 ("R & R"). With respect to the § 1983 claim, Magistrate Judge Ellis found that extraordinary circumstances justified equitable tolling of the statute of limitations, and that Teodorovic's family exercised reasonable diligence in pursuing this action throughout the period they sought to toll. *See id.* Over County Defendants' objection, this Court, per the Hon. George B. Daniels, adopted the R & R in its entirety on June 12, 2013 (the "June 2013 Opinion"). Doc. 19.

---

[15] Plaintiff also brought claims under New York State law. These state law claims were dismissed on June 12, 2013, *see* Doc. 19 at 3–4, and are not at issue in the present motion.

On July 12, 2013, the County Defendants moved for leave to file an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) on the question of whether the June 2013 Opinion was correctly decided.  Doc. 23.  The case was subsequently reassigned to the undersigned on July 17, 2013.  On March 31, 2014, the undersigned denied the County Defendants' motion for leave to file an interlocutory appeal because they did not establish that exceptional circumstances justified a departure from the basic policy of postponing appellate review until after the entry of a final judgment.  Doc. 25 at 8–9.  The County Defendants then answered the Complaint, as did Coté.  Docs. 27, 35.  In January 2015, Plaintiff moved to amend the Complaint and add a new party as a Defendant.  Doc. 59.  The County Defendants opposed the motion, *see* Doc. 67, and the Court denied the motion on September 3, 2015, 09/03/2015 Text Entry of Magistrate Judge Ronald L. Ellis.

The only claim that remains is Plaintiff's claim pursuant to 42 U.S.C. § 1983.  With discovery complete, on September 30, 2016, Plaintiff filed a motion for summary judgment.  Docs. 159–165.  On December 14, 2016, the County Defendants filed their opposition to Plaintiff's motion and their cross motion for summary judgment.  Docs. 173–177.

## III.    LEGAL STANDARD

To prevail on summary judgment, the movant must show that "there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  "A 'material' fact is one that might 'affect the outcome of the litigation under the governing law.'"  *Id.*  "The function of the district court in considering the motion for summary judgment is not to resolve disputed

questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp*., 609 F.3d 537, 545 (2d Cir. 2010). On a summary judgment motion, the district court "may not make credibility determinations or weigh the evidence . . . . 'Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Id.* at 545–46 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

When confronted with cross-motions for summary judgment, the Court analyzes each motion separately, 'in each case construing the evidence in the light most favorable to the non-moving party.'" *Peterson v. Kolodin*, No. 13 Civ. 793 (JSR), 2013 WL 5226114, at *1 (S.D.N.Y. Sept. 10, 2013) (quoting *Novella v. Westchester Cty.*, 661 F.3d 128, 139 (2d Cir. 2011)); *see also Morales v. Quintel Entm't, Inc*., 249 F.3d 115, 121 (2d Cir. 2001) ("[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.") (citation omitted). The Court is not required to resolve the case on summary judgment merely because all parties move for summary judgment. *Morales*, 249 F.3d at 121.

## IV.    DISCUSSION

Plaintiff seeks summary judgment on his only remaining claim—the § 1983 claim—against all Defendants. County Defendants maintain that the claim is time-barred, and even if it were not, Plaintiff has not submitted sufficient evidence to create a triable issue of fact with respect to *Monell* liability.

**A. Statute of Limitations and Equitable Tolling**

The County Defendants assert that the § 1983 claim is time barred under the applicable statute of limitations. Plaintiff maintains that the Court's previous decision on the motion to dismiss should be upheld and that the doctrine of equitable tolling still applies.

Federal courts deciding § 1983 claims apply the statute of limitations for personal injury actions of the state in which they sit. *Wilson v. Garcia*, 471 U.S. 261, 274 (1985). In New York, that statute of limitations is three years. *See Owens v. Okure*, 488 U.S. 235, 251 n.1 (1989). "Although federal law determines when a § 1983 claim accrues, state tolling rules determine whether the limitations period has been tolled, unless state tolling rules would defeat the goals of section 1983." *Abbas v. Dixon*, 480 F.3d 636, 641 (2d Cir. 2007) (internal quotation marks and citation omitted). To enforce these goals, courts in this Circuit deciding § 1983 claims have applied the federal equitable tolling standard, which allows tolling where "extraordinary circumstances prevented a party from timely performing a required act." *Walker* v. *Jastremski,* 430 F.3d 560, 564 (2d Cir. 2005) (quoting *Doe* v. *Menefee,* 391 F.3d 147, 159 (2d Cir. 2004) (internal quotation marks omitted)). A court considers whether the person seeking application of the equitable tolling doctrine has: (1) acted with reasonable diligence during the proposed tolling period; and (2) proven that the circumstances are so extraordinary that the doctrine should apply. *Zerilli-Edelglass v. N.Y. City Transit Auth.*, 333 F.3d 74, 80–81 (2d Cir. 2003), *as amended* (July 29, 2003) (citing *Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 512 (2d Cir. 2002)). The burden of demonstrating the appropriateness of equitable tolling rests with the plaintiff. *Boos v. Runyon*, 201 F.3d 178, 185 (2d Cir. 2000); *Upadhyay v. Sethi*, 848 F. Supp. 2d 439, 445 (S.D.N.Y. 2012).

The County Defendants previously moved to dismiss the § 1983 claim as time-barred, but Magistrate Judge Ellis found that extraordinary circumstances justified equitable tolling and that Teodorovic's family exercised reasonable diligence in pursuing this action throughout the period they sought to toll. *See* R & R. Over County Defendants' objection, this Court, per the Honorable George B. Daniels, adopted the R & R in its entirety. Doc. 19. Defendants now ask the Court to revisit that determination, arguing that a district court is not prevented from granting summary judgment after denying a motion to dismiss based only on a plaintiff's allegations in the Complaint, taken as true. Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendants Westchester County Department of Corrections and Westchester County's Cross-Motions for Summary Judgment ("Defs.' Opp.") (Doc. 176) at 4–5.

In the R & R, Judge Ellis, accepting the facts presented by Plaintiff,[16] noted that Teodorovic's only family lived outside the United States, and that they were only apprised of his death years later, at the beginning of 2006, when the FBI was able to contact them. *See* R & R at 3, 8. His biological mother retained counsel, but those attorneys later withdrew from the case. *See* Doc. 19 at 3. Once retained, the new attorney, Moses—Plaintiff in this action—had to navigate a lengthy process of revoking the original letters of administration and getting appointed as administrator. *See* R & R at 9. Specifically, in deciding to apply the equitable tolling doctrine to Plaintiff's § 1983 claim, the Court relied on the following allegations:

- From the day of the incident until Teodorovic's death fourteen months later in December 2001, he was in a coma. Doc. 19 at 7.

---

[16] The record before Judge Ellis included the allegations in the Complaint, its attached exhibits, and a declaration from Plaintiff in support of his opposition to the 12(b)(6) motion. *See* Doc. 10; *see generally* R & R.

- Rajna, Teodorovic's biological mother and sole distributee, inherited Teodorovic's claim, but she did not learn what had happened to her son until May of 2006. Up until that point she was not aware of the factual basis for her claim. *Id.* at 7–8.

- In May 2006, once Rajna learned of the incident from the FBI, she immediately initiated the legal process. She retained Tolmage, Peskin, Harris & Falick and secured letters of administration so that Kelly and Teodorovic's sister, as co-administrators of the estate, could bring Teodorovic's claims. Kelly then undertook to preserve Teodorovic's claims by attempting to file a late notice of claim. Kelley's request was denied on April 17, 2007. *Id.* at 8.

- Once the request to file a late notice of claim was denied, Teodorovic's family was under the mistaken impression that they had no other legal recourse. It was not until after Coté's conviction was upheld by the Second Circuit, on May 18, 2009, that they began to hope that they might have some other means of seeking redress.[17] Here, there is evidence that Teodorovic's family continued to seek legal advice, consulting at least one other attorney before finding Moses. *Id.* at 8–9.

- Upon retaining Moses, Teodorovic's family was required to go through a long process of revoking Furst and Kelly's letters of administration and appointing Moses as administrator of the estate, a process that was complicated by distance and language difficulties. *Id.* at 9.

Ultimately, the Court accepted Magistrate Judge Ellis' R & R in its entity, holding that the Teodorovic family and their representatives exercised reasonable diligence given the difficulties and delays inherent in attempting to find and coordinate effective legal representation across three countries and in multiple languages. While the Court was required to accept as true all of the above allegations at the motion to dismiss stage, County Defendants argue that the uncontroverted facts developed during discovery compel a different result at the summary judgment stage.[18] For the prior motion to dismiss, the record was limited to a declaration

---

[17] The Court notes that the Second Circuit decision was actually issued on September 24, 2008. *See Coté*, 544 F.3d at 88.

[18] Reassessing the issue at the summary judgment stage is proper with a more fully developed record. The law of the case posits that when a court decides upon a rule of law, that decision should generally continue to govern the same issues in subsequent stages in the same case. *Arizona v. California*, 460 U.S. 605, 618 (1983). Despite this, the application of the law of the case doctrine depends on the context, and the court's prior rulings "are subject to revision by that court at any time before the entry of final judgment." *Rezzonico v. H & R Block, Inc.*, 182 F.3d 144, 148–149 (2d Cir. 1999).

submitted by Moses and the allegations in the Complaint, and Magistrate Judge Ellis noted that he was "presented with incomplete evidence as to the actions taken by the Teodorovic family throughout the ten years between the incident and the filing of the instant claim." R & R at 7.

The County Defendants present the following additional facts developed during discovery: the only contact information that Teodorovic provided as an emergency contact for the DOC upon his admission to Jail in October 2000 was his stepmother, Bentley. Defs.' 56.1 ¶¶ 48, 191. Bentley speaks English and worked as a financial analyst for Blue Cross for approximately thirty-five years before she retired. *Id.* ¶ 150. In the early morning hours of October 11, 2000, within twelve hours of the incident, Bentley was contacted and advised that Teodorovic was gravely ill and in the hospital. *Id.* ¶ 190. Based on these facts, the County Defendants argue that since notification was made in accordance with Teodorovic's directives, the County Defendants should not be faulted for an alleged failure on the part of Bentley to notify Teodorovic's other family members abroad. Defs.' Opp. at 6. They further argue that the fact that Teodorovic's mother lived outside the United States and did not speak English—the rationale that the Court used in the R & R—is entirely irrelevant and that there are no grounds for equitable tolling in light of the above-outlined facts, which became clear only during discovery. *Id.* The Court agrees. Moreover, the Court notes that Bentley advised Furst in December 2001 that Teodorovic was "deathly injured," and in February 2002 that he died while in a coma and an attorney was seeking to sue the Jail as a result. Furst later contacted the Embassy in 2004 regarding the matter. So, contrary to the record before Judge Ellis, Teodorovic's family knew of his death nearly five years prior.

Even if the Court were to find that exceptional circumstances justified tolling even though the County Defendants notified Bentley in accordance with Teodorovic's directives in

2000, Teodorovic's family was fully aware of the incident and had retained legal counsel to represent the estate as of September 29, 2006. By then, Furst retained a law firm in New York and executed a General Durable Power of Attorney. Shortly thereafter, on November 22, 2006, Furst was appointed as co-administrator for the estate with Brian Kelly, an attorney from that firm. Assuming *arguendo* that Teodorovic's estate was entitled to equitable tolling due to the difficulties inherent in navigating a legal system from another country and language barriers, the Court finds there are no grounds to extend the tolling past November 22, 2006, because, as of that date, the estate had both the factual information and the legal authority to commence an action for damages. Previously, the Plaintiff even described former counsel Peskin as "well respected" and "a former Past President of the New York State Trial Lawyers Association." *See* Doc. 10 ¶ 8. However, more than three years passed, and no action was filed on behalf of Teodorovic's estate. In the interim, the Second Circuit upheld Coté's conviction.

Although counsel sought to preserve Teodorovic's claims by attempting to file a late notice of claim in state court, the application was denied on April 17, 2007. Defs.' 56.1 ¶ 273. The estate's counsel was aware that, even though the Westchester Supreme Court denied the application to file a late Notice of Claim, he was permitted to proceed with a 42 U.S.C. § 1983 claim against the County Defendants. *See* Peskin's Reply Affirmation in Support of Motion, ¶ 9 (Doc. 17-1 at 29) (stating that, "it is clear that a notice of claim is not necessary to commence an action under 42 USC 1983 nor with regard to the County's responsibilities to the estate with regard to its claim pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978).").

Thus, certainly no later than November 2006, the factors on which the Court relied earlier—Teodorovic's mental incapacity, death, the difficulty in finding his family, the family member's difficulties with the English language, or a lack of knowledge as to what happened to

Teodorovic or the criminal proceedings against Coté—are less compelling in light of the notice provided to Bentley in 2000 and Furst in 2001. Nothing that happened after November 22, 2006 rises to the level of "extraordinary circumstances" sufficient to trigger any additional equitable tolling once the family understood the factual basis for the claims and retained legal counsel on behalf of the estate. Rather, the only explanation for why the claim was not filed within three years after this point was counsel's determination that "even if there [was] a conviction against [Coté] there [would] be no cause against the County of Westchester which has the money as opposed to the individual corrections officer who has no money" and therefore "it would appear to be a waste of time to file a lawsuit…" Defs.' Opp, Ex. BBB. Even if an argument could be made that counsel's decision not to pursue civil remedies on behalf of the estate constituted attorney misconduct, the Second Circuit has made it clear that an attorney's lack of due diligence does not warrant the application of the equitable tolling doctrine. *South v. Saab Cars USA, Inc.*, 28 F.3d 9, 12 (2d Cir. 1994) ("[L]ack of due diligence on the part of plaintiff's attorney is insufficient to justify application of an equitable toll.") (internal citations and quotations omitted); *see also Carter v. Univ. of Connecticut*, 264 F. App'x 111, 112 (2d Cir. 2008) (holding equitable tolling not warranted and noting that Plaintiff "is not, however, left without any remedy for his former attorney's misconduct" because he "remains free to pursue a malpractice claim against the attorney, through which he could presumably seek damages arising from the loss of his ability to prosecute his Title VI claim.").[19]

---

[19] The Second Circuit has, however, held that "[a]ttorney misconduct, if it is sufficiently egregious, may constitute the sort of extraordinary circumstances' that would justify the application of equitable tolling . . . of AEDPA." *Baldayaque v. United States*, 338 F.3d 145, 153 (2d Cir. 2003). No bright line rule exists regarding whether attorney misconduct is sufficient, and here the record does not justify a finding of misconduct, nor does Plaintiff even appear to allege misconduct.

Thus, the Court finds that exceptional circumstances do not warrant equitable tolling, GRANTS County Defendants' motion for summary judgment, and dismisses the sole remaining § 1983 claim as time-barred.

## B. Section 1983 Claim

Even if the Court did not dismiss the case on the basis of the statute of limitations, the Court finds that it would dismiss the claim against the County Defendants on the merits.[20]

Both parties cross-move for summary judgment on the § 1983 claim, which is apparently based on a claim that Teodorovic was the victim of excessive force while incarcerated as a pretrial detainee. *See* Cmplt. ¶¶ 65–68.[21]  While Plaintiff alleges that the use of excessive force was in violation of the Eighth Amendment, the Court notes that a pretrial detainee is protected against excessive force under the Due Process Clause of the Fourteenth Amendment. *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) ("While the Eighth Amendment's protection does not apply 'until after conviction and sentence . . . the right of pretrial detainees to be free from excessive force amounting to punishment is protected by the Due Process Clause of the Fourteenth Amendment . . . .") (internal citations omitted); *see also Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2475 (2015) (distinguishing excessive force claims brought by convicted prisoners

---

[20] However, for the reasons discussed *infra*, if the action were not dismissed as time-barred, Plaintiff's claim against Coté would survive.

[21] The Complaint alleges that Defendants are liable under the statute for several causes of action: "violent assault and battery," wrongful death, intentional infliction of emotional distress, negligent infliction of emotional distress, "pain and suffering," "severe bodily injury resulting in multiple bone fractures, brain trauma, extended coma, and subsequent death," an "unjust liberty restraint to induce a violent beating," "violation of civil rights, civil liberties, and human rights," pecuniary damages and lost wages, and the Eighth Amendment. *See* Compl.

Additionally, throughout his motion for summary judgment papers, Plaintiff makes some references to allegations regarding a lack of appropriate medical care. This claim is outside the scope of Plaintiff's Complaint, and unsupported by the evidence necessary to establish a *Monell* claim against the County Defendants on such grounds. Thus, to the extent Plaintiff is attempting to assert a new such claim at this juncture, it must be dismissed.

under the Eighth Amendment's Cruel and Unusual Punishment Clause and claims brought by pretrial detainees under the Fourteenth Amendment's Due Process Clause).

### 1. Preclusive Effect of Coté's Prior Criminal Conviction

Plaintiff argues that Coté's federal criminal conviction supports his position that Coté violated Teodorovic's civil rights and therefore compels summary judgment in the instant case. Pl.'s Mem. L. at 2. The doctrines of *res judicata* and collateral estoppel apply to civil rights lawsuits brought pursuant to 42 U.S.C. § 1983. *Allen v. McCurry*, 449 U.S. 90, 101 (1980); *Banks v. Pers.*, 49 F. Supp. 2d 119, 126 (E.D.N.Y. 1999). The Government bears a higher burden of proof in the criminal than in the civil context and it may consequently may rely on the collateral estoppel effect of a criminal conviction in a subsequent civil case. *See United States v. Podell*, 572 F.2d 31, 35 (2d Cir. 1978). A party other than the Government may also assert collateral estoppel based on a criminal conviction. *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 43 (2d Cir. 1986). "In the case of a criminal conviction based on a jury verdict of guilty, issues which were essential to the verdict must be regarded as having been determined by the judgment." *Emich Motors Corp. v. Gen. Motors Corp.*, 340 U.S. 558, 569 (1951). Federal criminal convictions have collateral estoppel effect in federal civil actions where: (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and decided, (3) there was a full and fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits. *S.E.C. v. McCaskey*, No. 98 Civ. 6153 (SWK), 2001 WL 1029053, at *3 (S.D.N.Y. Sept. 6, 2001). Thus, "[c]ollateral estoppel does not apply where the party against whom an earlier court decision is asserted did not have a full and fair opportunity to litigate the claim or issue decided by the first court." *Allen*, 449 U.S. at 101.

As to Defendant Coté, the Court finds that his criminal conviction has preclusive effect on the issue of whether he violated Teodorovic's civil rights under § 1983. Coté was indicted by the United States for violating 18 U.S.C. § 242,[22] the criminal counterpart of § 1983, and, on September 20, 2006, was convicted by a federal jury of that charge. Although the district judge overturned the conviction, the Second Circuit reversed and upheld the conviction. *Coté*, 544 F.3d at 88. For the jury to convict Coté of violating Teodorovic's right to be free from excessive force, it had to find that he: (1) acted under color of law; (2) used excessive force amounting to punishment; (3) acted willfully; and (4) caused bodily injury. *Id.* at 98. Thus, just as in the present proceeding, the propriety of Coté's conduct and whether he used excessive force causing Teodorovic's injuries was at issue in criminal proceeding. Coté had a full and fair opportunity to litigate the issue of excessive force in the criminal matter, and evidence of his willful conduct was necessary to support the judgment. *See Scott W. Brothers v. Akshar*, No. 05 Civ. 1265, 2007 WL 9225084, at *6 (N.D.N.Y. July 10, 2007), *aff'd*, 383 F. App'x 47 (2d Cir. 2010). Thus, if the Court did not dismiss the claim against Coté based on the statute of limitations, the Court would grant Plaintiff's motion with respect to Coté on the merits because whether Coté used excessive force against Teodorovic was litigated and conclusively determined in the criminal matter.

---

[22] Section 242 provides:

> Whoever, under color of any law, statute, ordinance, regulation or custom willfully subjects any person in any State, Territory, Commonwealth, Possession or District to a deprivation of any rights, privileges or immunities secured or protected by the Constitution or laws of the United States . . . shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section . . . shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section . . . shall be fined under this title or imprisoned for any term of years or for life or both, or may be sentenced to death.

18 U.S.C.A. § 242 (1996).

County Defendants, however, argue that they are not bound by the prior determination that Coté violated Teodorovic's civil rights because they were not parties to that criminal proceeding. Defs.' Opp. at 12. Plaintiff concedes that Coté's criminal conviction "cannot be binding on the County." Pl.'s Opp. at 9. Therefore, the Court finds that because the County Defendants had no opportunity to litigate the legality of Coté's actions, his criminal conviction does not have preclusive effect as to them. *See Henderson v. Town of Greenwich,* 317 F. App'x 46, 47–48 (2d Cir. 2009) (affirming summary judgment in favor of town defendant where it was not a party to federal prosecution of police officer).

### 2. Whether the DOJ Report is Inadmissible Hearsay

County Defendants argue that not only has Plaintiff failed to establish the existence of a municipal policy that led to the incident sufficient to warrant summary judgment, but he also has not raised sufficient evidence to present a question of fact in this regard. Defs.' Opp. at 10.

From an evidentiary perspective, two pieces of evidence are central to many of Plaintiff's claims: a November 30, 2009 press release from the DOJ and a November 19, 2009 DOJ Report relating to the CRIPA Investigation at the Jail—both contained in Plaintiff's Exhibit 83. County Defendants argue that both exhibits are inadmissible hearsay, stating further that the statements within are "nothing other than allegations based on a unilateral investigation by the DOJ" and that the County Defendants dispute the DOJ's findings. Defs.' 56.1 ¶ 89. Plaintiff argues these documents are non-hearsay under the public records exception to the hearsay rule. Plaintiff's Memorandum of Law in Opposition ("Pl.'s Opp.") (Doc. Doc. 180) at 29–30.

A public records hearsay exception exists in civil cases for "factual findings from a legally authorized investigation." Fed. R. Evid. 803(8)(A)(iii).[23]  These findings can take the form of an evaluative report containing both opinions and conclusions.  *Jordan v. Binns*, 712 F.3d 1123, 1132 (7th Cir. 2013).  A report that combines such statements with an investigator's on-scene observations and conclusions based on the sum of the evidence falls within the Rule 803(8) exception.  *Id.* at 1134; *Daniel v. Cook Cty.*, 833 F.3d 728, 739–40 (7th Cir. 2016).  Such an evaluative report is presumed to be admissible in a civil case.  *Jordan,* 712 F.3d at 1132.  Courts assume that public officials, in crafting such a report, acted "properly and without bias."  *See* Fed R. Evid. 803(8) advisory committee's note ("Justification for the exception is the assumption that a public official will perform his duty properly. . . .").

Here, the DOJ Report and accompanying press release satisfy the criteria of Rule 803(8)—they contain factual findings from an investigation carried out by the DOJ, and County Defendants have not suggested that the Report lack trustworthiness.  Thus, the Court finds that the Report and press release regarding the Report fall under this exception to the hearsay rule.  *See Daniel*, 833 F.3d at 728 (findings from a DOJ investigation of health care provided at county jail were admissible under hearsay exception in § 1983 action by pretrial detainee against jail, alleging deliberate indifference in violation of the Fourteenth Amendment; investigation was conducted in accordance with DOJ's statutory authority); *McDaniels v. City of Philadelphia*, 234 F. Supp. 3d 637, 649 (E.D. Pa. 2017) (DOJ report that identified deficiencies in city police

---

[23] Fed. R. Evid. 803(8) applies to:

> [r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth . . . matters observed pursuant to duty imposed by law as to which matters there was a duty to report . . . [or] in civil actions and proceedings against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of the information or other circumstances indicate lack of trustworthiness.

*Id.*

department's use-of-force policies was a public report admissible under hearsay exception, at summary judgment stage of § 1983 action, since it contained factual findings from an investigation carried out by DOJ); *see also Shepherd v. Dallas Cty.*, 591 F.3d 445, 457 (5th Cir. 2009) (admitting DOJ Report under Rule 803(8)(C)); *Valdez v. City of Philadelphia*, No. 2:12 Civ. 7168 (CDJ), 2016 WL 2646667, at *3 (E.D. Pa. May 10, 2016) (DOJ Report regarding use of deadly force falls under Rule 803(8)(C) hearsay exception).

Although it is admissible, the Report is not conclusive, of course, and the County Defendants are entitled to a full opportunity to rebut it, or argue that its findings are not relevant or are inapplicable to issues in the present case, including *Monell* liability. The Court addresses County Defendants' objections regarding the relevance and merit of the DOJ Report as it relates to Plaintiff's *Monell* claim *infra*.

### 3. Municipal Liability

"Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell,* 436 U.S. at 691. A municipality cannot be held liable under § 1983 solely on a theory of *respondeat superior*. *Id.* at 692. Thus, the County Defendants cannot be held liable solely because their employee, Coté, was found liable. A Section 1983 claim can only be brought against a municipality if the action that is alleged to be unconstitutional was the result of an official policy or custom. *Id.* at 690, 691; *see also Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011) ("A municipality or other local government may be liable under this section [1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation.") (quoting *Monell*, 436 U.S. at 692)).

The Second Circuit has established a two-pronged test for Section 1983 claims brought against a municipality. First, the plaintiff must prove "'the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving [official].'" *Johnson v. City of New York*, No. 06 Civ. 9426 (GBD), 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (quoting *Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985)). Second, the plaintiff must establish a causal connection between the policy or custom and the alleged deprivation of his constitutional rights. *Id.*

To satisfy the first requirement, a plaintiff must prove the existence of:

> (1) a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by government officials responsible for establishing municipal policies which caused the alleged violation of the plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom or usage and implies the constructive knowledge of policy-making officials; or (4) a failure by official policy-makers to properly train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact.

*Moray v. City of Yonkers*, 924 F.Supp. 8, 12 (S.D.N.Y. 1996) (internal citations and quotation marks omitted); *see also Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (quoting *Moray* and updating citations to cases).

Although a plaintiff is not required to identify an express rule or regulation to establish a *Monell* claim, proof of "a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d. Cir. 1998) (quoting *Ricciuti v. N.Y. City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)) (internal quotation marks omitted); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 127 (1988) (plurality opinion) (explaining that only municipal officials who

have "final policymaking authority" concerning the particular activities giving rise to a plaintiff's claims "may by their actions subject the government to § 1983 liability") (citation omitted).

### a) Pattern or Practice of Excessive Use of Force

Plaintiff attempts to establish a pattern of excessive use of force, relying heavily on the DOJ Report. As an initial matter, the Court notes that many of the constitutional violations discussed in the Report are issues different from those alleged by Plaintiff, including health care and treatment of minors. Notably, with respect to its findings regarding the use of excessive force, the DOJ Report only found a pattern and practice of the use of excessive force with respect to incidents involving the ERT. DOJ Report at 7. The ERT is a team of correction officers and supervisors who respond to incidents such as inmate-on-inmate and inmate-on-staff assaults. *Id.* at 7, n.6. Each ERT is comprised of several correctional officers outfitted in full riot gear and helmets, and falls under the command of the Emergency Services Unit ("ESU"). *Id.* It is not disputed that the incident at issue here did not involve wrongdoing by ERT personnel.

To illustrate with greater specificity the unconstitutional patterns it identified, the DOJ also reviewed "hundreds of [the Jail's] use of force incidents from 2006–2007, dozens of which were captured on videotape." DOJ Report at 8. Plaintiff argues that the DOJ's findings—and the underlying incidents described in the Report—establish a pattern or practice of excessive force. However, those specific examples from that two year period took place six and seven years after the incident. Plaintiff contends that in his effort to establish that the same conditions existed in 2000, his discovery requests sought video evidence of incidents from 1996 to the date of the incident, but that no videos were ever produced. Pl.'s Opp. at 33. However, no motion to compel that evidence was filed with the Court, and for summary judgment purposes, the Court must look to the evidence in the factual record.

Thus, to the extent that Plaintiff relies on the DOJ Report to establish a pattern or practice of excessive use of force, that Report cannot do so. Where such a gap in time exists between findings in an official report and Plaintiff's allegations, the events are too disconnected in time and personnel to plausibly allege a policy, practice, or custom extant in 2000 so as to affect Teodorovic. *See Rodriguez v. Cty. of Westchester*, No. 15 CIV. 9626 (PAE), 2017 WL 118027, at \*7 (S.D.N.Y. Jan. 11, 2017) (dismissing *Monell* claim and holding that the same DOJ Report from February 2008 at issue in this case was too remote in time because the Report was written more than six years before the events in question occurred and involved separate third-party contractors); *Melvin*, 2016 WL 1254394, at \*15 (dismissing *Monell* claim and holding that the same DOJ Report from February 2008 was too remote in time because the Report was written more than four years before the events in question occurred and involved a separate third-party contractor).

In addition to the DOJ Report, Plaintiff attempts to establish that a pattern of the same unconstitutional conditions referenced in the DOJ Report existed at the time of the incident by referencing entries in a document entitled "Disciplinary Log." Pl.'s 56.1 Ex. 85. The Disciplinary Log was produced by the County Defendants in discovery and appears on its face to be an official County record denoting discipline of Jail employees for various infractions. *See* Defs.' Opp. at 33. County Defendants object that it is inadmissible hearsay, but because this is County Defendants' own record, the statements are admissible because they are admissions by party-opponent and thus are not hearsay. *See* Fed. R. Evid. 801(d)(2).[24]

---

[24] Moreover, although Plaintiff does not argue the Log is a business record, the documents would also be admissible under that exception. *See* Fed. R. Evid. 803(6).

The Disciplinary Log includes records from a five year period from 1998 to 2002 that includes the name of the person charged, date of the incident, nature of the incident, period of suspension, attorney assigned to the case at the law department, imposition of discipline served, final disposition, results, and whether the case is closed. *See* Pl.'s 56.1 Ex. 85. However, although the County Defendants "admit that the 'Disciplinary Log' shows two incidents of 'excessive use of force,' CO Coté in the incident in question (2000) and CO Delaney[25] in 2001," *see* Defs.' 56.1 ¶ 87, the Court is unable to infer a pattern of excessive force from these two isolated incidents over a period of five years.

Plaintiff suggests that the fact that only two officers were disciplined for excessive force is itself evidence of an indifference to constitutional protections and a failure on the part of County Defendants to adequately discipline officers. That is, Plaintiff argues it is "common knowledge" that force is regularly used at a jail with 1500 inmates and that use of force by correction officers would be a daily occurrence. Pl.'s Opp. at 17, 34–35. However, to be entitled to make that inference, Plaintiff would need to show, at minimum, some number of incidents of use of excessive force that were not prosecuted during that time. This he cannot do on this record without resorting to mere conjecture. Absent actual evidence that the County Defendants had a pattern or practice of using excessive force or failure to discipline officers for inappropriate use of force during the time period in question, the Court can draw no such conclusion. Moreover, Plaintiff would need to present the factual bases and the context for the disciplinary actions listed in the log for the Court to draw any conclusions about a pattern or practice of excessive force.

---

[25] The incident involving Delaney was a separate incident of excessive force in which Delaney pled guilty and received a letter of reprimand. *See* Defs.' 56.1 ¶¶ 87, 115.

Thus, the Court finds Plaintiff has not met its burden to demonstrate a pattern or practice of unconstitutional behavior based on the DOJ Report or the Disciplinary Log.

### b) Deliberate Indifference

"*Monell's* policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)).  However, such a failure to act, train, or supervise can constitute a municipal custom "only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need." *Reynolds*, 506 F.3d at 192 (citing *City of City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).  "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it extends liability to a municipal organization where that organization's failure to train, or the policies or customs it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006).

*In City of Canton v. Harris*, 489 U.S. 378 (1989), the Supreme Court set out the "deliberate indifference" standard in the context of a claim for failure to train, but "the stringent causation and culpability requirements set out in that case have been applied to a broad range of supervisory liability claims," including claims for failure to supervise and failure to discipline. *Reynolds*, 506 F.3d at 192 (citing *Amnesty America*, 361 F.3d at 127 (failure to supervise) and *Berry v. City of Detroit*, 25 F.3d 1342, 1354 (6th Cir. 1994) (failure to discipline)).  Therefore, "where a policymaking official exhibits deliberate indifference to constitutional deprivations

caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence may 'be properly thought of as a city 'policy or custom' that is actionable under § 1983.'" *Amnesty America*, 361 F.3d at 126 (quoting *City of Canton*, 489 U.S. at 388).

The Second Circuit has outlined the three requirements which must be met before a municipality's failure to act constitutes deliberate indifference to the rights of citizens in what is commonly called "the *Walker* Test": first, that a policymaker knows "to a moral certainty" that his or her employees "will confront a given situation"; second, "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and third, "that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)); *see also Reynolds*, 506 F.3d at 192 (finding deliberate indifference "where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights"). The Supreme Court also has noted, however, that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train," and that "deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 131 S.Ct. at 1359–60 (internal quotation marks omitted). A plaintiff's own, unsubstantiated allegations of a municipal policy is insufficient to sustain a claim at the summary judgment stage. *See Jackson v. Cnty. of Nassau*, No. 07 Civ. 245 (AKT), 2010 WL 1849262, at *11–36 (E.D.N.Y. May 6, 2010) (granting summary judgment in favor of a county on plaintiff's *Monell* claim, because the "mere assertion that a municipality has such a policy is insufficient to establish *Monell* liability," and

"in any case[,] plaintiff may not overcome summary judgment by relying merely on allegations or denials in its own pleading.").

Here, Plaintiff bases his *Monell* claim in part on the argument that County Defendants failed to properly train, supervise, and discipline its employees. Specifically, Plaintiff asserts several ways in which he believes that the County Defendants demonstrated deliberate indifference regarding the follow-up to the incident in question, including, *inter alia*: (1) the County Defendants' failure to prosecute Reimer; (2) Assistant Warden O'Neill's lack of follow-up and investigation on the evening of the incident, and the lack of an official police policy requiring him to do so; (3) a poorly conducted investigation following the incident; (4) alleged inadequate medical care Teodorovic received at the hospital;[26] and (5) the lack of effort made to contact Teodorovic's family after the incident.[27]

Plaintiff's argument that the DOC's decision not to bring charges against Reimer "shows deliberate indifference to his complicity in a serious felony assault that lead to a homicide" is without merit. First of all, the decision to prosecute or not prosecute Reimer was made not by these defendants, but rather by the prosecuting authorities. And it is well established that

---

[26] To the extent that Plaintiff suggests that Teodorovic did not receive appropriate medical care at the hospital because the DOC did not advise medical personnel as to how Teodorovic specifically sustained his injuries (from repeated kicking as opposed to hitting his head on the floor), there is no evidence to suggest his medical care was impaired in any way.

[27] Plaintiff also references throughout his moving papers that Sergeant Woods, another employee who was accused of helping cover-up and fabricate the reporting of the incident "committed a crime for which he was never prosecuted." Pl.'s Mem. L. at 1. Woods was responsible for commencing an investigation of the incident and hand wrote Reimer's report for him. Defs.' 56.1 ¶¶ 44, 47. Reimer later wrote a sworn statement indicating that Woods instructed him to include false information in his initial report to cover up the incident. Woods denied these allegations and claims that he only wrote what was dictated to him by Reimer. Pl.'s 56.1 Ex. 82 at 9. The WCPD interviewed Woods on October 30, 2000. *Id.* at 7. While the detective on the case believed that there was probable cause to arrest Woods for official misconduct and filing a false instrument and contacted the District Attorney's ("D.A.'s") Office several times with the intention of arresting Woods, the D.A.'s Office advised the WCPD that they did not believe there was sufficient evidence to charge him. *See id.*; Defs.' 56.1 ¶ 67. Ultimately, the SIU concurred with the District Attorney's office and determined that the charges that Woods knowingly submitted a false report and attempted to cover up the incident were unsubstantiated in light of conflicting evidence. *Id.* ¶ 69.

prosecutors are given broad discretion concerning whom to prosecute and what charges to bring. *See, e.g., Torres v. Hoke*, No. 88 Civ. 3959, 1989 WL 100033, at *2 (E.D.N.Y. Aug. 21, 1989), *aff'd*, 940 F.2d 649 (2d Cir. 1991) (citing *United States v. Goodwin*, U.S. 368, 380 n. 11 (1982)). As to Plaintiff's argument that departmental charges should have also been brought against Reimer, the Court does not find this compelling, as Reimer had recanted his statement and was cooperating with law enforcement authorities in the investigation, so any decision not to bring departmental charges or disciplinary action was reasonable given the lead role played by the prosecutors.

Moreover, all of these alleged acts of deliberate indifference relate to the single alleged incident in the Complaint—the assault of Teodorovic and subsequent investigation. However, it is well-settled that "a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal liability." *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998). To establish liability under *Monell*, a plaintiff must demonstrate that the conduct of the officers was "so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 131. Therefore, the single incident at issue here stemming from Coté's assault of Teodorovic is insufficient to establish liability for County Defendants. *See, e.g., Jie Yin v. NFTA*, 188 F. Supp. 3d 259, 274 (W.D.N.Y. 2016).

In limited circumstances, however, "a pattern of similar violations might not be necessary to show deliberate indifference." *Connick*, 563 U.S. at 63. The Supreme Court has refused "to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* As an example, the Court theorized in *City of Canton v. Harris*, 489 U.S. 378 (1989), that failing to provide an armed police officer with any training

about the constitutional limitations on the use of deadly force could constitute deliberate indifference. *Id.* at 390 n.10. Given the known frequency with which police attempt to arrest fleeing felons and the "predictability that an officer lacking specific tools to handle that situation will violate citizens' rights," the Court theorized that a municipality's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the "highly predictable consequence." *Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 398 (1997). However, the Supreme Court has specifically cautioned against engaging "in an endless exercise of second-guessing municipal employee-training programs." *Canton,* 489 U.S. at 392.

The *Canton* hypothetical assumes that the armed police officers have no knowledge at all of the constitutional limits on the use of deadly force, but it is undisputed here that the DOC had a use of force policy and the officers in question were trained in it. Although Plaintiff disputes the adequacy of the use of force policy, pointing to the DOJ's findings, the Court finds the facts here do not rise to the same level of deliberate indifference as was hypothesized in *Canton*. There was a use of force policy created in October 1996, which was in effect in October 2000, that placed the authority for using force with superior officers, unless there were exigent circumstances. Pl.'s 56.1 Ex. 103 ("Use of Force Policy") at 1 ("Authority for the use of force and security equipment shall rest with the supervisor. Staff is authorized to use appropriate force when an escape is in progress or that danger to persons or damage to property is imminent. In an emergency where it is not possible or practical to seek authorization, an employee shall use appropriate force and LATER, SHALL BE REQUIRED TO JUSTIFY THAT ACTION.") (capitalization and underline in original). In other words, unless there were exigent circumstances, if a correction officer anticipated using force, he was required to contact his

supervisor first.[28]  Plaintiff argues that a supervisory presence during the incident in question "would be a BIG deterrent, and would have saved [Teodorovic] because [the Officers] could not have concocted their false reports . . . ."  Pl.'s Opp. at 10 (emphasis in original).  A violation of the Use of Force Policy subjected a correction officer to disciplinary charges under the DOC's Code of Conduct.  Defs.' 56.1 ¶ 221.  The Use of Force Policy also required all use of force incidents to be reported orally to a supervisor immediately.  *Id.* ¶ 228 (referring to Use of Force Policy, which states, **"REPORT ANY USE OF FORCE a) Immediately to supervisor, orally and b) In writing (Special Report) by end of shift."**) (capitalization and bold in original).

As to the implementation of the Use of Force Policy, Reimer indicated that he was aware of the policy but did not anticipate using force at the time of the incident with Teodorovic.  Defs.' 56.1 ¶¶ 91, 94, 99, 216–217.  Coté also confirmed that he received use of force training and testified that, with respect to use of force, the policy was to only use the minimal amount of force necessary to control and inmate or a situation.  *Id.* ¶¶ 18, 236–53.  Coté further agreed that, pursuant to the policy, if an officer anticipates using force, the first step is to contact a supervisor.  *Id.* ¶ 91.  In addition, Coté attended a twelve week training course when he was first hired by the DOC, which included a one week session on the use of force, which is commonly referred to as "Article 35 training."  Pl.'s 56.1 Reply ¶¶ 238, 240.  It is also undisputed that DOC employees were required to attend an Article 35 training session once a year.  Defs.' 56.1 ¶ 123.  The most recent Article 35 training session that Coté attended before the incident was five months prior, on May 2, 2000.  *Id.* ¶ 248.

---

[28] Plaintiff attempts to argue that the Use of Force Policy "permitted the emergency use of force and not the anticipated use of force" and that there was no policy or guideline regarding use of force when an inmate "posed no immediate threat."  Pl.'s Opp. at 10–12.  The Court finds that this distinction between emergency use of force and anticipated use of force is of no moment for purposes of *Monell* liability.

Moreover, despite Plaintiff's conclusory assertions about the lack of follow-up and investigation following the incident, the DOC did have a review process in place for use of force incidents. There is no material factual dispute that the DOC review process was followed with respect to the incident.[29] Not only was the matter referred to SIU, but it was also immediately referred to the Westchester County Police Department for a criminal investigation. The investigation ultimately resulted in Coté's immediate suspension, subsequent prosecution, and criminal conviction.

However, even if a use of force policy did exist at the Jail, County Defendants "may also be liable simply by reason of its deliberate indifference to a known custom or practice of its employees . . . ." *Nicholson v. Scoppetta*, 344 F.3d 154, 166 (2d Cir.), *certified question accepted*, 1 N.Y.3d 538, 807 N.E.2d 283 (2003), and *certified question answered*, 3 N.Y.3d 357, 820 N.E.2d 840 (2004). Municipal policies may be found not only in written regulations or in affirmative acts but also in certain omissions on the part of policymaking officials. *See Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (citing *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989)). Specifically, a failure to investigate incidents of force, and by extension, a failure to discipline officers for use of excessive force, can amount to an actionable policy under § 1983 when such failure evidences "deliberate indifference" to the rights of persons with whom the police come into contact. *Fiacco v. City of Rensselae*r, 783 F.2d 319, 326 (2d Cir. 1986) (holding city's systemic failure to investigate claims of excessive force sufficient to support municipal liability); *Vineyard v. Cnty. of Murray, Ga.*, 990 F.2d 1207, 1212 (11th Cir. 1993) (holding inadequate policies of supervision, discipline and training of police officers demonstrated the deliberate indifference "to the rights of arrestees to be free from the use of

---

[29] Plaintiff argues that the review process as followed was flawed and that, had it not been for the confession of Reimer, "the truth would not have come out." Pl.'s Opp. at 20.

excessive force"); *Galindez v. Miller*, 285 F. Supp. 2d 190, 198–200 (D. Conn. 2003) (finding city's failure to reasonably investigate complaints and absence of punitive consequences for any accused officer after more than seventy excessive force complaints over three years sufficient to support *Monell* claim); *McKnight v. D.C.*, 412 F. Supp. 2d 127, 133 (D.D.C. 2006) ("A municipality may be liable under § 1983 for its failure to investigate incidents of force, and by extension, its failure to discipline officers for use of excessive force, when such failure amounts to deliberate indifference to the constitutional rights of persons within its jurisdiction.").

Plaintiff alleges that the Jail systematically failed to investigate incidents of force and appropriately discipline officers for use of excessive force. As support for this position, Plaintiff argues in part that the same policies and procedures were in place in 2000 as they were in 2008 when the DOJ conducted its investigation and found that use of force reporting was inadequate. Specifically, the DOJ concluded that the Jail's Use of Force Policy, SOP V-01-09—the same Use of Force Policy in effect at the time of Teodorovic's detainment—"does not contain a generally applicable reporting requirement for corrections officers who use force on inmates or witness correction officers' use of force on inmates." DOJ Report at 14. The DOJ further found that the Code of Conduct, which had not been revised since 1998, does not contain provisions that prohibit physical abuse of inmates and does not define excessive or unnecessary force. *Id.* at 17.

The DOJ ultimately concluded that the Jail "fails to adequately document uses of force in its written reports" and that "[f]ailure to review uses of force effectively provides Jail Staff with unfettered use of force." DOJ Report at 14. The DOJ noted that adequate policies and practices would include, at a minimum, "screening of all use of force and incident reports, specific criteria for initiating investigations based upon the report screening, specific criteria for initiating

investigations based upon allegations from any source, timelines for the completion of internal investigations, and an organized structure and format for recording and maintaining information in the investigatory file." *Id.* at 17. Plaintiff's expert, Patrick Walsh, reached a similar conclusion, finding that the Use of Force Policy is inadequate and that the Code of Conduct fails to provide proper guidance regarding employee sanctions when excessive force is used. *See* Pl.'s 56.1 Ex. 93 at 25–27.

County Defendants argue the Use of Force Policy was adequate, and point to testimony of Jail personnel indicating that it was DOC's policy that a sergeant would investigate a use of force incident, and that for certain "important situations" such as escapes, serious injuries, or deaths, there was a written policy to notify higher ranks. Defs.' 56.1 ¶ 47. While the DOC policy did not require use of force incidents to be automatically forwarded to SIU, it was within an officer's discretion to report such an incident to SIU. *Id.* Moreover, the Use of Force policy in effect at the time required all use of force incidents to be reported orally to a supervisor and in writing through a Special Report by the end of the shift. County Defendants argue that with respect to this incident, the DOC policy's regarding reporting were expressly followed—ERT responded to the scene of the incident, summoned medical personnel, and the appropriate individuals were notified in the chain of command. *Id.* Approximately sixteen hours after the incident—on October 11, 2000, SIU notified the Westchester County Police Department about the incident. *Id.*

The Second Circuit's decision in *Fiacco v. City of Rensselaer*, 783 F.2d at 319, is particularly instructive as it relates to the sufficiency of evidence for proving inadequate reporting or disciplinary procedures. The evidence on which the Second Circuit affirmed a jury verdict of municipal liability consisted of the following: the existence of general procedures

relating to appropriate supervision of police officers but a failure to implement those policies, seven written civilian complaints of police brutality (occurring within the five years previous to the incident at issue in the case), testimony of four of those complainants, and testimony of the police chief regarding his handling of each of the four testifying witnesses' cases as well as a fifth excessive force claim (three of the five cases concerned one of the defendant officers). The Second Circuit held that such evidence demonstrated, among other things, the repeated failure to investigate complaints or, if an investigation was conducted, to hold any hearings or take statements other than those of the officers involved, and to impose any discipline. *Id.* at 331–332. Here, Plaintiff's proffered evidence lacks the equivalent testimony of an individual with knowledge about the County Defendants' process of reviewing complaints and disciplining officers, or an extensive record of complaints.

Plaintiff further argues that the County Defendants had several "red flags" about Coté specifically that should have put them on notice that he was a potential problem, and thus they were deliberately indifferent in their supervision and discipline of him. Plaintiff's list of "red flags" includes, *inter alia*, that:

- A 1999 evaluation of Coté noted that he was "sometimes a little overzealous";

- In 1996, Coté sustained a broken hand in an altercation involving force being used against an inmate;

- Coté was named in two lawsuits (the *Ramos* and *Thrower* matters) and deposed in another lawsuit (the *Roca* matter);

- Coté was friends with Joseph Miranda ("Miranda"), the Chief of Operations;

- Coté had a verbal disagreement with another officer for which he was "written up;" and

- In 1996, another inmate, Inmate Felton, alleged that Coté used excessive force.

Pl.'s Mem. L. at 22–23.

39

In considering these instances as a whole, the Court finds that the County Defendants' supervision and discipline of Coté did not rise to the level of deliberate indifference. For example, that he was noted for being a little overzealous on a review in which he received average, above average, and exemplary remarks in all categories is immaterial. On that same review, he was also noted for being diligent and requiring little supervision. As to the hand injury, Plaintiff has provided no evidence of any alleged wrongdoing by Coté in connection with that incident. As to his relationship with Miranda, Plaintiff provides no evidence to suggest that this friendship was inappropriate or resulted in favorable treatment to Coté. As to the disagreement with another officer, the Court finds there is no probative value with respect to Plaintiff's *Monnell* claim that Coté had an argument with a co-worker—the Court cannot discern any way that this should have put the County Defendants on notice that Coté was prone to use excessive force on detainees.

Additionally, the Court finds the *Thrower* lawsuit lacks probative value, as the plaintiff there was not granted permission to name Coté as a Defendant until January 2002—more than a year after the subject incident—and thus this lawsuit could not have put the County Defendants on notice.[30] With respect to the *Ramos* lawsuit, Plaintiff has provided only the complaint, and thus has not provided any information regarding the disposition of the action.[31] With respect to the *Roca* deposition, Plaintiff has provided only a letter asking Coté to return his deposition transcript, and thus has not provided any information regarding the factual basis of the action. Lastly, although the *Felton* matter involves an allegation of excessive force by Coté on July 20,

---

[30] The *Thrower* matter involved an incident in 1999 for which Coté would later be named in a lawsuit for using excessive force when he was employed by ERT at the jail. *Thrower* alleged that ERT members beat plaintiff, causing him serious injury to his lower back.

[31] The complaint alleges that in 1995 a fictitious officer named "John Cote" and others assaulted the plaintiff and used excessive force on several occasions.

1996—four years prior to the incident—the documentation in the matter indicates that it was forwarded to SIU, and these allegations, along with the allegations in the *Ramos* complaint, are not enough to establish the County Defendants were deliberately indifferent in their supervision or discipline of Coté.

Thus, the evidence is insufficient to support a finding that, in supervising Coté, the County Defendants disregarded a known or obvious risk of injury. *See, e.g., Bd. of Cty. Comm'rs of Bryan Cty., Okla.* 520 U.S. at 410 (holding evidence insufficient to impose municipal liability for inadequate hiring). Based on these incidents, there is no evidentiary basis to support Plaintiff's suggestion that there was a need to give Coté additional training or to reprimand him, nor is there any evidentiary basis to find that the County Defendants knew or should have known that Coté was capable of committing the assault of which he was ultimately convicted. Considering all of the evidence taken together and viewed in the light most favorable to the Plaintiff, the Court finds that the County Defendants' behavior did not rise to the level of deliberate indifference.

### c)  Causation

Ultimately, however, even assuming that the Plaintiff had presented sufficient evidence that the County Defendants demonstrated deliberate indifference to the rights of its detainees due to their failure to require use of force reporting or failure to properly discipline employees who used excessive force, and despite a general inferred tendency that a failure to have effective policies might encourage serious violations, Plaintiff has failed to make the requisite showing that the allegedly deficient policy was an actual cause of the specific violation alleged here.

The existence of an official policy or custom is insufficient to impose liability on the County Defendants. *See Canton*, 489 U.S. at 390. Plaintiff must also show that the policy was

the "moving force" of the specific constitutional violation at issue. *See id.* at 389. In *Canton*, the Court stated the proper inquiry is whether "the injury [would] have been avoided had the employee been trained [and supervised and disciplined] under a program that was not deficient in the identified respect[s]?" *Id.* at 391. The Court finds that Plaintiff has failed to point to any evidence that the absence of an excessive force reporting or investigation mechanism in any way motivated the incident. *See Lester v. City of Gilbert*, 85 F. Supp. 3d 851, 863 (S.D.W. Va. 2015) (granting summary judgment to the city where, even assuming that the city had a policy of deliberate indifference related to a lack of excessive force training and documenting incidents, there was no evidence that the absence of a complaint investigation mechanism caused the incident in question); *see also Usavage v. Port Auth. of New York & New Jersey*, 932 F. Supp. 2d 575, 601 (S.D.N.Y. 2013) (finding the plaintiff's argument that the municipal defendant's policy of allowing internal investigators to determine which footage to share and delete allowed police officers to engage in excessive use of force without fear of being recorded and thus led to the alleged excessive use of force against the plaintiff was "extraordinarily attenuated—so attenuated that, in the relevance sense of the term, [the] policy of preserving video footage cannot be said to have caused the alleged excessive use of force."). On the contrary, Coté testified that he lied to cover up his actions because he knew that the County would not tolerate his conduct and he would face repercussions.

* * *

Thus, if the Court were to consider the merits of this action, it would find that the *Monell* claim cannot be established as a matter of law. In short, Plaintiff has not produced sufficient evidence to move to trial on the issue of *Monell* liability against County Defendants.

## V.  CONCLUSION

For the foregoing reasons, the Court GRANTS the County Defendants' cross-motion for summary judgment and DENIES Plaintiff's motion for summary judgment, thus dismissing Plaintiff's sole remaining claim.  The Clerk of the Court is respectfully directed to terminate the motions, Docs. 164 and 173, and close the case.

It is SO ORDERED.


Dated:     September 29, 2017
           New York, New York

                                                    Edgardo Ramos, U.S.D.J.